UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
TEACHERS INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA, et al.,

                Plaintiffs,

        -against-                                    06 Civ. 0392 (LAK)

CRIIMI MAE SERVICES LIMITED
PARTNERSHIP, et al.

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

        Gregory A. Cross
        Colleen M. Mallon
        Lawrence H. Cooke II
        VENABLE LLP
        *Attorneys for Plaintiffs*

        Thomas H. Richey
        Jennifer D. Odom
        Michael P. Carey
        Daniel P. Waxman
        BRYAN CAVE LLP
        *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge*.

        This action presents a dispute concerning the modification and sale of a loan by the special servicer of a trust. The complaint alleges that the special servicer breached its obligations to the trust and thereby unjustly enriched its parent corporation. One of the defendants has counterclaimed for attorneys' fees. The matter is before the Court on cross motions for summary

judgment.

*Facts*

I.    The Trust

Plaintiffs Teachers Insurance Annuity Association of America ("TIAA"), Minnesota Life Insurance Company, and Advantus Series Fund, Inc., Mortgage and Bond Portfolios own over twenty-five percent of an outstanding class of certificates that represent beneficial interests in two real estate mortgage investment conduits ("REMIC"s or, collectively, the "Trust").

The Trust *res* consists of fixed-rate mortgage loans made to separate borrowers that are secured by mortgage liens on real estate. The Trust issued several classes of certificates entitling the holders to certain rights with respect to its assets and cash flow. Different classes of certificates have various rights, including the right to receive distributions from payments to the Trust of loan principal, loan interest, or both.

Plaintiffs are holders of Class A-CS2 Certificates, which entitle them to receive distributions derived solely from interest payments made by the borrowers of the REMIC loans.[1] The loans are governed by agreements that restrict the manner in which borrowers voluntarily repay the loans, thereby protecting the ability of interest-only certificate holders to receive revenue from the borrowers' interest payments.

Defendant CRIIMII MAE Services Limited Partnership ("CMSLP") is a special servicer of the Trust and a wholly owned subsidiary of defendant CRIIMI MAE, Inc. ("CRIIMI").[2]

---

[1] Pl. 56.1 St. [DI 94] ¶¶ 8-9. Plaintiffs own also Class A-1 and A-3 Certificates. *Id.* ¶ 9.

[2] *See* Def. 56.1 St. [DI 89] ¶ 19.

3

Pursuant to the Pooling and Servicing Agreement ("PSA"), of which CMSLP and the trustee are signatories, CMSLP administers and services loans on behalf of the Trust and for the benefit of the certificate holders.[3] The PSA requires that CMSLP service loans "in the best interest of and for the benefit of all the Certificateholders" irrespective of "the ownership of any Certificate by the Servicer, the Special Servicer or any Affiliate."[4]

Defendant CRIIMI owns Class A-CS3, B-1, and B-2 Certificates.[5] The Class B Certificates entitle it to receive payments of principal made on the REMIC loans. Class B certificate holders, however, have the lowest payment priority. They receive distributions only when Class A certificate holders have been paid in full. It therefore is in the interest of Class B certificate holders that REMIC loans be repaid as quickly as possible to accelerate their receipt of distributions from those loans.

II.   *The Hardage Loan*

Hardage Hotels I, LLC ("Hardage") was the obligor of one of the loans owned by the Trust.[6] The loan included a fixed payment schedule and prohibited the borrower from voluntarily paying the debt before its maturity.[7] This "lockout" provision protected the rights of interest-only

---

[3] CMSLP and the trustee are signatories to the PSA.

[4] Pl. Ex. A, PSA § 3.01.

[5] *See* Pl. 56.1 St. [DI 94] ¶ 9.

[6] *Id.* ¶ 1.

[7] *Id.* ¶ 3.

4

certificate holders to receive interest distributions derived from the loan. In 2003, however, Hardage experienced financial problems, and its loan was transferred to CMSLP for special servicing.[8]

In May 2003, CMSLP and Hardage entered into the so-called Modification Agreement that waived the prepayment restriction, allowing Hardage to prepay the debt without penalty.[9] A short time later, CMSLP sold the loan.[10] The proceeds from the sale of the Hardage loan were treated as repayments of the loan's principal and distributed accordingly. The sale therefore eliminated the interest payments that Classes A-CS2 and A-CS3 would have received from the Hardage loan[11] while Class A-1,[12] B-1, and B-2 certificate holders received payments of principal derived from the sale proceeds.[13]

### III. This Action

On March 11, 2005, plaintiffs sent a notice of default to CRIIMI, CMSLP, and the trustee pursuant to Section 10.02 of the PSA, which governs the ability of certificate holders to declare a default and bring an action in connection with the PSA. The notice alleged that CMSLP's modification and sale of the Hardage loan constituted an event of default under the PSA. On the

---

[8] *Id.* ¶ 13.

[9] *Id.* ¶¶ 23-24.

[10] *Id.* ¶ 41.

[11] *Id.* ¶ 43.

[12] *Compare* Pl. 56.1 St. [DI 94] ¶¶ 43, 61 *with* Def. 56.1 St. [DI 85] ¶¶ 43, 61.

[13] *Id.* ¶¶ 65-66.

same date, plaintiffs, on behalf of Class A-CS2, wrote to the trustee, demanding that the trustee institute an action against CMSLP and CRIIMI on the grounds that they breached the PSA and their fiduciary duties to the certificate holders and unjustly enriched themselves.[14] After allowing the trustee to initiate an investigation concerning the allegations in their demand letter, plaintiffs, purporting to represent Class A-CS2 certificate holders, filed this action for breach of contract and disgorgement against CMSLP and CMSLP Management Company, Inc., and unjust enrichment against CRIIMI on December 6, 2005.[15]

The complaint alleges that CMSLP breached its duty to "service and administer the Mortgage Loans on behalf of the Trust Fund solely in the best interests of and for the benefit of all of the Certificateholders." It alleges also that CMSLP failed to consider alternatives to modifying the Hardage loan and did not properly notify the Trust and its certificate holders of the Modification Agreement.[16] It asserts that CMSLP, CRIIMI's wholly owned subsidiary, negotiated the Modification Agreement to serve CRIIMI's interests and increase the value of its certificates, to the detriment of the interest-only certificate holders.[17] Defendants counterclaim for attorneys' fees.

Defendants now move for summary judgment dismissing the complaint. They argue,

---

[14] *Id.* ¶ 61. No other Classes joined in that demand. *Id.* ¶¶ 61-63.

[15] *See* Notice of Removal [DI 1]. The Court dismissed plaintiffs' claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, gross negligence, and punitive damages pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Order [DI 37].

[16] Plaintiffs claim that CMSLP breached its duties to "obtain an appraisal of the Mortgaged Property" from an independent appraiser and to hire an "experienced" consultant in connection with the appraisal pursuant to PSA Sections 3.10 and 3.25(e), respectively.

[17] *See, e.g.*, Cpt. [DI 1] ¶¶ 61-65.

6

among other things, that plaintiffs failed to satisfy the "no action" conditions of PSA Section 10.02, entitled "Limitation on the Rights of Certificateholders," before bringing this action. They contend also that plaintiffs have failed to raise a genuine issue of material fact as to their claim that CMSLP breached the PSA. Plaintiffs move for partial summary judgment on their contract claim and for summary judgment dismissing the counterclaim for attorneys' fees. They contend that defendants breached the PSA as a matter of law and that there is no basis for an award of attorney's fees.

*Discussion*

I.      *The Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[18] Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[19] In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[20]

---

[18] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000); *see also* FED. R. CIV. P. 56(c).

[19] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin At. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[20] *See, e.g.*, *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001); *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997).

7

II.     The Breach of Contract Claim

    A.     PSA Section 10.02

Defendants contend that plaintiffs' claim for breach of contract should be dismissed because plaintiffs failed to comply with Section 10.02 of the PSA, a "no action" clause that limits the rights of certificate holders to initiate litigation in connection with the PSA. It provides:

> "No Certificateholder shall have any right to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of default and of the continuance thereof, as herein before provided, and unless also the Holders of Certificates representing Percentage Interests of at least 25% of each affected Class of Certificates shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 30 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding."[21]

The "no action" clause thus provides that a certificate holder may institute an action only if three salient requirements are satisfied. First, the certificate holder must give written notice of default to the trustee. Second, the holder must represent 25 percent in interest "of each affected Class of Certificates" and request the trustee to commence the action in its own name. Third, it must wait thirty days after giving notice to the trustee before filing an action.

Plaintiffs concededly satisfied the first and third conditions. The central question here is whether the second requirement has been satisfied. That depends upon whether any class of certificates other than the Class A-CS2 certificates held by plaintiffs was "affected" within the meaning of Section 10.02. The question is dispositive because plaintiffs do not represent any other certificate class.

---

[21]     Pl. Ex. A, PSA § 10.02.

As the Court held in adopting the report and recommendation of the magistrate judge with respect to defendants' motion to dismiss the complaint, the term "each affected Class of Certificates" is ambiguous because it is reasonably susceptible to more than one meaning.[22] Where there is extrinsic evidence that may resolve such an ambiguity, "a jury, and not a court, should decide what meaning is to be ascribed to the contract."[23] Here, however, neither plaintiffs nor defendants are signatories to the PSA. Neither have offered extrinsic evidence to resolve the ambiguity.[24] The Court therefore must construe the ambiguous language on the parties' cross-motions for summary judgment.[25]

By way of introduction, it is well to recognize that no action clauses are common

---

[22] *See* R&R [DI 25] at 10-11.

[23] *Chase Manhattan Bank, N.A. v. Keystone Distrib., Inc.*, 873 F. Supp. 808, 811 (S.D.N.Y. 1994); *see also Williams & Sons Erectors, Inc. v. S.C. Steel Corp.,* 983 F.2d 1176, 1184 (2d Cir. 1993) ("When the provisions of the contract are susceptible to conflicting constructions *and* when there is also relevant extrinsic evidence of the parties' actual intent, the meaning of the provisions becomes an issue of fact barring summary judgment.") (emphasis in original).

[24] Although defendants offer the testimony of the trustee's and TIAA's corporate representatives, who surmised that the ambiguous language means "adversely affected by an alleged event of default," there is nothing to suggest that those representatives were involved in negotiating or drafting the PSA. *See* Def. Mem. at 21. That testimony therefore is not of value in resolving the ambiguity.

[25] *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) ("A court may also grant summary judgment regarding the interpretation of ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language."); *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994) ("[A]mbiguity itself is not enough to preclude summary judgment. Rather, in order for the parties' intent to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent."); *Williams & Sons Erectors*, 983 F.2d at 1184 ("Ambiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on.").

9

features of trust indentures and other instruments and have received significant judicial and other attention over the years. They typically provide in substance that no action may be brought for an alleged breach of an indenture or other instrument absent notice of an alleged breach and a request on behalf of the holders of a minimum percentage in interest of the securities in question that the trustee institute suit.[26] In such cases, there is no doubt as to the identity of the security holders, a stated percentage in interest of whom must join in the request, because the indenture usually covers only a single bond or other security. The no action clause at issue here, however, requires notice and a request of the trustee on behalf of holders of a minimum percentage interest of "each affected Class." Thus, unlike a case involving a typical no action clause, there is uncertainty here as to the identity of the security holders whose actions are material. In consequence, cases under typical no action clauses are of limited relevance.

Plaintiffs argue that no action clauses in general are disfavored and narrowly construed. They maintain that Section 10.02 in particular is unenforceable because it is ambiguous and, what amounts to the same thing, did not place certificate holders on notice of the respects in which their rights to sue were limited.[27] Defendants counter that Section 10.02 is properly construed as requiring joinder in the notice and demand of twenty-five percent in interest of each class "that was adversely affected by an alleged event of default" and that Classes A-1, A-CS3, and B-2 all

---

[26] *See, e.g., McMahan & Co. v. Wherehouse Ent., Inc.,* 65 F.3d 1044, 1051 (2d Cir. 1995); *Cruden v. Bank of New York,* 957 F.2d 961, 967-68 (2d Cir. 1992); *Met. West Asset Mgmt., LLC v. Magnus Funding, Ltd.,* No. 03 Civ. 5539 (NRB), 2004 WL 1444868, at *4 (S.D.N.Y. June 25, 2004); George W. Shuster, Jr., *The Trust Indenture Act and International Debt Restructurings,* 14 AM. BANKR. INST. L. REV. 431, 435 & n.15 (2006).

[27] Pl. Mem. [DI 92] at 27.

were adversely affected.[28]  Plaintiffs rejoin that Class A-1 was not adversely affected because it received a payment of principal larger than it would have received but for the sale of the Hardage loan and, in any case, was paid in full in August 2007.  They argue also that Classes A-CS3, B-1, and B-2 are wholly owned by CRIIMI, which cannot be expected to sue itself.[29]

As an initial matter, plaintiffs' ambiguity argument is without merit.  Ambiguity does not render a contractual provision unenforceable.  It requires resolution as a predicate to enforcement of the contract.  And while no action clauses are to be applied with care, the cases upon which plaintiffs rely do not require or even suggest the result they favor.[30]  So the Court turns to defendants' argument that several classes of certificates were affected adversely by the alleged default.

---

[28] Def. Mem. [DI 84] at 21-22.

[29] Pl. Mem. [DI 92] at 27-28.

[30] In *Cruden v. Bank of New York*, 957 F.2d 961, the Second Circuit stated that it would be "absurd to require the debenture holders to ask the Trustee to sue itself."  But this sheds no light on the proper construction of the clause here at issue.  Similarly, in *Metroplitan West Asset Management, LLC v. Magnus Funding, Ltd.*, 2004 WL 1444868, the court held that "[w]here, as here, a 'no action' provision applies by its terms to only claims relating to an 'Event of Default', . . . such clauses do not prevent noteholders from bringing extra-contractual tort claims or breach of contract claims that are not of the type to which the 'no action' provision, by its terms, applies."  Here, however, plaintiffs assert neither tort claims nor contract claims beyond the reach of § 10.02.  In *McMahon & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, the Second Circuit held that "individual securityholders may not be forced to forego their rights under the federal securities laws due to" a "no action" provision.  Plaintiffs, however, do not claim that the no action clause here conflicts with substantive law.  Finally, *In re Globo Comunicacoies E Participacoes S.A.*, 317 B.R. 235, held only that a "claim predicated on a materially ambiguous [no action clause] is not dismissible on the pleadings."  It "remand[ed] for the Bankruptcy Court's construction of the clause according to the relevant legal standards."  *Id.* at 248-49.

### 1.   *Classes A-CS2 and A-CS3*

The default alleged in plaintiffs' notice of default is the special servicer's modification and sale of the Hardage loan. The sale eliminated the interest payments that Class A-CS2, owned by plaintiffs, and Class A-CS3, owned by CRIIMI, would have received from the Hardage loan. As Classes A-CS2 and A-CS3 received distributions derived solely from interest payments,[31] they were affected adversely by the sale, which caused them economic losses.[32] This is not to say, however, that the failure of CRIIMI, as a Class A-CS3 holder, to join in the notice and demand is material.

Plaintiffs argue that it would be illogical to construe Section 10.02 to require CRIIMI, as a holder of Class A-CS3 (and B-2) Certificates, to join in plaintiffs' notice and demand that the trustee sue CMSLP, CRIIMI's wholly owned subsidiary. Our Circuit indeed has refused to construe a no action provision to achieve an analogous result. In *Cruden v. Bank of New York*,[33] it stated that it would be "absurd to require the debenture holders to ask the Trustee to sue itself" pursuant to a "no action" provision.[34] *Cruden* therefore suggests, and I hold, that Section 10.02 cannot be

---

[31] *See* Def. 56.1 St. [DI 78] ¶ 33.

[32] Pl. 56.1 St. [DI 94] ¶ 43. Plaintiffs dispute the proposition that Class A-CS3 "suffered economic losses as a result of the sale of the Hardage loan" on the ground that "the evidence cited by the Defendants does not and cannot establish the facts alleged in the Statement." *Compare* Pl. 56.1 St. [DI 94] ¶ 43 *with* Def. 56.1 St. [DI 85] ¶ 43. The testimony defendants cite, however, supports that proposition. In particular, the trustee's corporate representative testified that "A-CS3 would have, once the sale took place, no longer received interest." *See* Def. 56.1 St. [DI 85] ¶ 43 (citing Ex. 37, Reis. Dep. 35:23-36:7). Plaintiffs have failed to identify any evidence to the contrary. In consequence, defendants' proposition is deemed admitted. S.D.N.Y. CIV. R. 56.1(c).

[33] 957 F.2d 961 (2d Cir. 1992).

[34] *Id.* at 967-68.

12

construed to condition plaintiffs' right to sue CRIIMI's subsidiary upon CRIIMI's agreement. The failure of CRIIMI, as the only Class A-CS3 holder,[35] to join in the notice and demand is immaterial.

### 2. *Class B-2*

Defendants claim also that Class B-2, which is wholly owned by CRIIMI, was affected adversely. That is not clear as a factual matter because there appears to be a conflict between the testimony of Cynthia Reis, the trustee's corporate representative, who stated that "[t]he B-2 class would have had a write-down of principal"[36] without explaining how that would have affected Class B-2 adversely, and CRIIMI chief executive Barry Blattman, who stated that CRIIMI's classes "are better off in terms of the instrument we own if somebody prepays."[37] But the question whether Class B-2 was adversely affected is beside the point for the reason stated above – CRIIMI's failure to join in the notice and demand that the trustee sue its subsidiary is not material.

### 3. *Class A-1*

Defendants claim also that Class A-1 was affected adversely by the sale of the Hardage loan.

Defendants rely first on Reis's testimony that Class A-1 "would have received principal from the sale [of the Hardage loan but] perhaps not as much as they would have had [the

---

[35] Defendants do not dispute the proposition that CRIIMI "purchased a 100% interest" in Classes A-CS3 and B-2. *Compare* Pl. 56.1 St. [DI 78] ¶ 18 *with* Def. 56.1 St. [DI 90] ¶ 18. That proposition therefore is deemed admitted. S.D.N.Y. Civ. R. 56.1(c).

[36] *See* Def. 56.1 St. [DI 85] ¶¶ 43, 65 (citing Reis Dep. 35:23-36:7).

[37] *See* Pl. 56.1 St. [DI 94] ¶ 43; Pl. 56.1 St. [DI 78] ¶ 37 (citing Blattman Dep. 84:2-4).

12

construed to condition plaintiffs' right to sue CRIIMI's subsidiary upon CRIIMI's agreement. The failure of CRIIMI, as the only Class A-CS3 holder,[35] to join in the notice and demand is immaterial.

### 2. *Class B-2*

Defendants claim also that Class B-2, which is wholly owned by CRIIMI, was affected adversely. That is not clear as a factual matter because there appears to be a conflict between the testimony of Cynthia Reis, the trustee's corporate representative, who stated that "[t]he B-2 class would have had a write-down of principal"[36] without explaining how that would have affected Class B-2 adversely, and CRIIMI chief executive Barry Blattman, who stated that CRIIMI's classes "are better off in terms of the instrument we own if somebody prepays."[37] But the question whether Class B-2 was adversely affected is beside the point for the reason stated above – CRIIMI's failure to join in the notice and demand that the trustee sue its subsidiary is not material.

### 3. *Class A-1*

Defendants claim also that Class A-1 was affected adversely by the sale of the Hardage loan.

Defendants rely first on Reis's testimony that Class A-1 "would have received principal from the sale [of the Hardage loan but] perhaps not as much as they would have had [the

---

[35] Defendants do not dispute the proposition that CRIIMI "purchased a 100% interest" in Classes A-CS3 and B-2. *Compare* Pl. 56.1 St. [DI 78] ¶ 18 *with* Def. 56.1 St. [DI 90] ¶ 18. That proposition therefore is deemed admitted. S.D.N.Y. Civ. R. 56.1(c).

[36] *See* Def. 56.1 St. [DI 85] ¶¶ 43, 65 (citing Reis Dep. 35:23-36:7).

[37] *See* Pl. 56.1 St. [DI 94] ¶ 43; Pl. 56.1 St. [DI 78] ¶ 37 (citing Blattman Dep. 84:2-4).

loan] been sold for full value."[38]  Reis later testified, however, that she did not "know the exact dollar amount" Class A-1 had stood to receive as distributions if the loan had not been sold,[39] thus undermining the conclusion that plaintiffs would have me draw.

Defendants refer also to an unlabeled chart that perhaps indicates some adverse change in position for the A-1 certificate holders.  But they neither identify the author of nor otherwise authenticate the document, and they do not explain what it depicts.[40]

In sum, the evidence defendants rely upon does not unequivocally establish that Class A-1 was affected adversely by the sale of the loan.[41]  In consequence, an issue of fact remains.

Plaintiffs nevertheless argue that they have satisfied Section 10.02, despite their failure to represent twenty-five percent in interest of Class A-1, because it was "paid off in full" in August 2007.[42]  Satisfaction of Section 10.02, however, was required prior to the commencement

---

[38] Def. 56.1 St. [DI 85] ¶¶ 43, 61 (citing Reis. Dep. 35:23-36:5).

[39] *See* Reis Dep. 151:15-22.

[40] *See* Def. 56.1 Reply ¶ 43 (citing Reply Ex. 3, TIAA-00767).  Defendants rely also on a letter from the trustee's attorneys to plaintiffs' attorneys asserting that [i]f the specific allegations of Special Servicer Events of Default . . . prove to be true, then other Classes of Certificates were 'affected,' including Class A-1 and Class A-CS3."  *See id.* (citing Ex. 47, LaSalle Dep. Ex. 12).  That letter, however, merely reflects the trustee's attorneys' legal conclusion and does not establish that Class A-1 was affected adversely by the sale of the loan.

[41] Plaintiffs contest defendants' contentions that Class A-1 was "adversely affected by the sale of the Hardage loan" and "suffered economic losses" on the ground that "the evidence cited by Defendants does not and cannot establish the facts alleged in the Statement."  Pl. 56.1 St. [DI 94] ¶¶ 43, 61.  They maintain that "Class A-1 received a lump sum payment of principal earlier than anticipated and was benefitted," but rely on an excerpt of Reis's testimony that they did not provide as an exhibit.  *See id.* (citing Reis Dep. 151:15-152:3.)

[42] Pl. 56.1 St. [DI 78] ¶ 151.

14

of this action in December 2005.[43] In consequence, assuming that Class A-1 was affected adversely, its failure to join in the notice and demand was necessary. The issue of fact as to whether that assumption is correct therefore is material.[44]

B.  PSA Section 7.01(b)(ii)

Section 7.01(b)(ii) of the PSA defines the term "Special Servicer Event of Default" as, *inter alia*:

> "any failure on the part of the Special Servicer to duly observe or perform in any material respect any other of the covenants or agreements or the breach of any representations or warranties on the part of the Special Servicer contained in this Agreement which continues unremedied for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Special Servicer by the Servicer, the Depositor or the Trustee, or to the Special Servicer, the Servicer, the Depositor and the Trustee by the Holders of Certificates evidencing Percentage Interests of at least 25% of any Class affected thereby."[45]

---

[43] *See, e.g.*, *Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03 Civ. 5539 (NRB), 2004 WL 1444868, at **4-5 (S.D.N.Y. Jun. 25, 2004) (stating that "[i]t is well established that "no action" clauses bar claims by individual bondholders who fail to comply with the conditions precedent recited therein" and that the clause at issue "sets forth five conditions that must be met before an individual noteholder may bring suit"); *Cont'l Cas. Co. v. State of N.Y. Mortgage Agency*, No. 94 Civ. 84008 (KMW), 1998 WL 513054, at *2 (S.D.N.Y. Aug. 18, 1998) (stating that no action clause of indenture contained "conditions to commencement of a suit by a bondholder"); *Victor v. Riklis*, No. 91 Civ. 2897 (LJF), 1992 WL 122911, at* 6 (S.D.N.Y. May 15, 1992) ("The 'no action' clause of those indentures prohibits an individual debentureholder such as Victor from pursuing 'any remedy with respect to [the] Indenture or the Securities' unless certain conditions have been met.").

[44] Plaintiffs urge the Court to construe the term "affected Class of Certificates" to mean "those classes of Certificates affected by the litigation" or the "Certificateholders affected by the litigation itself." See Pl. Mem. [DI 76] at 31, 33 n.14. That proposal, however, is entirely unavailing and, in any event, would not help plaintiffs.

[45] Pl. Ex. A, PSA § 7.01(b)(ii).

Defendants maintain that plaintiffs' breach of contract claim should be dismissed because they failed to satisfy Section 7.01(b)(ii) of the PSA and, in any event, waived their claim by "accepting the benefits" of the Hardage loan distribution.

Defendants' argument is misguided. Article VII of the PSA, which contains Section 7.01(b)(ii), sets forth a procedure for termination of a special servicer. Section 7.01(b)(ii) therefore defines "Special Servicer Event of Default" in the context of Special Servicer termination, not certificate holder litigation. Nothing in the PSA states that compliance with the notice and cure provision of Section 7.01(b)(ii) is a precondition to anything except removal of a special servicer. In consequence, so much of defendants' motion as seeks to dismiss plaintiffs' contract claim on the ground that plaintiffs did not comply with Section 7.01(b)(ii) is denied.[46]

C.  *PSA Section 6.03*

Defendants assert also that Section 6.03 of the PSA bars plaintiffs' claim. It provides, in pertinent part, that "[n]either the Depositor, the Servicer, the Special Servicer . . . shall be under any liability to the Trust Fund or the Certificateholders for any action taken, or for refraining from the taking of any action, in good faith pursuant to this Agreement, or for errors in judgment."[47] Defendants maintain that plaintiffs have failed to raise a material issue of fact as to whether CMSLP breached the PSA because it is insulated from liability for its good faith actions and "[t]here is not a shred of evidence that CMSLP's actions with regard to its workout of the

---

[46] Defendants' contention that plaintiffs waived their claim by "accepting the benefits" of the Modification Agreement raises genuine issues of fact.

[47] Pl. Ex. A, PSA § 6.03(a).

Hardage loan were taken in bad faith."[48]

Defendants ignore the express provision of Section 6.03 that "this provision shall not protect the Depositor or the Servicer or the Special Servicer . . . against any specific liability imposed on the Servicer or the Special Servicer pursuant to Section 3.01 for a breach of the servicing standard therein or any other Section hereof, or against any liability otherwise be imposed by reason of willful misfeasance, bad faith, fraud or negligence in the performing of duties."[49] As plaintiffs assert that CMSLP breached the servicing standard of Section 3.01 and its duty to obtain an appraisal of mortgaged property under Sections 3.10 and 3.25, Section 6.02 does not preclude their breach of contract claim. In addition, defendants have failed to demonstrate the absence of a genuine issue of material of fact as to whether CMSLP acted in good faith.

### D. Breach of the PSA

Defendants seek partial summary judgment dismissing plaintiffs' breach of contract claim, arguing that CMSLP satisfied its contractual duties as a matter of law. They maintain that the modification of the Hardage loan did not violate the servicing standard of Section 3.10 of the PSA and, in any event, that the Modification Agreement itself did not cause any harm to plaintiffs.[50] They rely upon a report by Pentalpha Group, a third-party consultant retained by the trustee, which investigated plaintiffs' allegations and concluded that CMSLP's actions "were consistent with the

---

[48] Def. Mem. [DI 84] at 24.

[49] Pl. Ex. A, PSA § 6.03(a).

[50] Def. Mem. [DI 84] at 24-25.

terms and conditions of the PSA."[51]

Plaintiffs cross move for summary judgment on the same claim. They rejoin that the modification and sale of the loan were "part of a single strategy to remove the loan from CRIIMI's portfolio" and that the testimony of "[d]efendants' own witnesses . . . is more than enough to raise issues of fact."[52] In addition, plaintiffs claim that "CMSLP's conduct violated the Servicing Standard's conflict of interest provisions" as a matter of law because "CMSLP had its opportunity to show evidence that its decision making process was disinterested and independent, but did not do so."[53]

The Court concludes that genuine issues of fact remain as to whether CMSLP breached the PSA. Plaintiffs have adduced evidence sufficient for a rational trier of fact to conclude that CMSLP did not administer the Hardage loan "solely in the best interests of and for the benefit of all of the Certificateholders." Summary judgment dismissing plaintiffs' breach of contract claim therefore would be inappropriate. By the same token, plaintiffs have not demonstrated an absence of genuine issues of fact material to their claim for relief.

II.   *Unjust Enrichment*

Defendants move also to dismiss plaintiffs' unjust enrichment claim against CRIIMI. "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same

---

[51] *Compare* Def. 56.1 St. [DI 85] ¶¶ 74-76 *with* Pl. 56.1 St. [DI 94] ¶¶ 74-76.

[52] Pl. Mem. [DI 92] at 30. *Compare* Def. 56.1 St. [DI 85] ¶73 *with* Pl. 56.1 St. [DI 94] ¶ 73.

[53] Pl. Reply Mem. [DI 102] at 4.

18

subject matter."[54] That principle applies even where "the party seeking to dismiss the claim is not a party to the contract."[55] An unjust enrichment claim therefore does not lie where a valid contract covers the subject matter that gives rise to the alleged enrichment.

Plaintiffs argue that the PSA does not cover the same subject matter as its unjust enrichment claim or, alternatively, that "[t]here is nothing in the PSA that provides Certificateholders a right of action or remedy against" CRIIMI, a nonsignatory to the PSA.[56] The argument, however, is not persuasive, as indicated by *Vitale v. Steinberg*.[57]

In that case, an employee sued his employer for breach of a bonus plan agreement, to which the employer and employee were parties. The employee alleged that the employer breached the agreement because its officers had diverted income to themselves and thereby deprived the employee of the bonus to which he was entitled. He sued also the employer's officers, who were not signatories to the agreement, in their personal capacities on the theory that the officers were unjustly enriched by the employer's breach. The court, however, dismissed the unjust enrichment claim, reasoning that "an express agreement govern[ed] the subject matter of plaintiff's claims," though the officers "were not signatories to that agreement" and the employee thus lacked a

---

[54] *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653 (1987) ("A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment.").

[55] *Micro Bio-Medics, Inc. v. Westchester Med. Ctr.*, 6 Misc.3d 1003(A), 800 N.Y.S.2d 350 (N.Y. Sup. Ct. 2004); *see also Feigen v. Advance Capital Mgmt. Corp.*, 150 A.D.2d 281, 283, 541 N.Y.S.2d 797 (1st Dep't 1989) ("[A] nonsignatory to a contract cannot be held liable where there is an express contract governing the subject matter.").

[56] Pl. Mem. [DI 93] at 33.

[57] 307 A.D.2d 107, 764 N.Y.S.2d 236 (1st Dep't 2003).

contractual right of action against them.[58]

The facts here are analogous. Although plaintiffs are not signatories to the PSA, they claim that CMSLP breached its obligations to them pursuant to the PSA by modifying and selling the Hardage loan. Plaintiffs claim also that CMSLP's breach – its modification and sale of the loan – unjustly enriched CRIIMI, a nonsignatory to the PSA.[59] The PSA, which defines the duty of CMSLP to service loans for the benefit of all certificate holders, therefore governs the subject matter of plaintiffs' claim for unjust enrichment. The fact that the PSA does not offer plaintiffs a right of action against CRIIMI is immaterial.

In consequence, plaintiffs' claims for unjust enrichment and disgorgement must be dismissed.[60]

III.     *The Counterclaim for Attorneys' Fees*

Plaintiffs move for summary judgment dismissing defendants' counterclaim for attorneys' fees.

A prevailing party may not recover attorney's fees unless an award of fees is authorized by an agreement between the parties, statute, or court rule.[61] The PSA does not provide

---

[58] *Id.* at 111.

[59] *See* Pl. Mem. [DI 92] at 1 ("CMSLP breached the Pooling and Servicing Agreement. . . . The same conduct unjustly enriched CRIIMI.").

[60] Disgorgement is merely an equitable remedy rather than a cause of action. *See SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006).

[61] *Baker v. Health Mgmt. Sys., Inc.*, 98 N.Y.2d 80, 88, 745 N.Y.S.2d 741 (2002); *Chase Manhattan Bank N.A. v. Each Individual Underwriter*, 258 A.D.2d 1, 4, 690 N.Y.S. 2d 570,

20

a right to recover attorney's fees. Contrary to defendants' contentions, neither Section 6.02 nor Section 10.02 provides the special servicer a right to indemnification by a certificate holder for its action under the PSA. The counterclaim therefore is dismissed.

*Conclusion*

For the foregoing reasons, defendants' motion for summary judgment dismissing the complaint [DI 83] is granted to the extent that plaintiffs' claims for unjust enrichment and disgorgement are dismissed and denied in all other respects. Plaintiffs' motion for summary judgment [DI 75] is granted to the extent that the counterclaim is dismissed and denied in all other respects.

SO ORDERED.

Dated:      February 3, 2010

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

572 (1st Dep't 1999).