UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
TEACHERS INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA, et al.,

                Plaintiffs,

       -against-                                          06 Civ. 0392 (LAK)

CRIIMI MAE SERVICES LIMITED PARTNERSHIP, et al.,

                Defendants.
------------------------------------------x

## MEMORANDUM OPINION

        Appearances:

               Thomas H. Richey
                Jennifer D. Odom
                Michael P. Carey
                Daniel P. Waxman
                BRYAN CAVE LLP
                *Attorneys for Plaintiffs*

                Gregory A. Cross
                Colleen M. Mallon
                VENABLE LLP
                *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

        Plaintiffs are trust investors who assert that they sustained damages as a result of a special servicer's allegedly improper modification and sale of a loan owed to the trust. The matter is before the Court on defendants' renewed motion for summary judgment of dismissal.

*Facts*

The Court assumes familiarity with its previous opinion.[1]

I.   The Trust

Plaintiffs hold beneficial interests in two real estate mortgage investment conduits (collectively, the "Trust") that were established pursuant to a Pooling and Servicing Agreement ("PSA") in October 1995.[2] The Trust *res* consists of fixed-rate mortgage loans made to separate borrowers that are secured by mortgage liens on real estate. Defendant CRIIMI MAE Services Limited Partnership ("CMSLP") is the Trust's special servicer, and in that capacity services and administers the Trust's mortgage loans for the benefit of the Trust's investors.

Upon execution of the PSA, the Trust took legal ownership of nine fixed-rate commercial mortgages with a combined principal balance of approximately $967 million.[3] It issued several classes of certificates representing different beneficial interests in the *res*.[4] Some classes are entitled to receive borrowers' payments of loan principal, others to payments of loan interest, and others to both. The PSA established a "waterfall" priority structure governing distribution of borrowers' principal payments wherein the senior class with an outstanding principal balance is to be

---

[1] *Teachers Ins. & Annuity Ass'n of Am. v. CRIIMI MAE Svcs. Ltd. P'ship*, 681 F. Supp.2d 501 (S.D.N.Y. 2010) (hereinafter *TIAA I*).

[2] *See* PSA, DI 135 Ex. C ("PSA").

[3] *Id.*, Preliminary Statement at 2.

[4] *Id.*

paid in full before the next class is entitled to principal disbursements.[5] As borrowers pay down the principal and interest on their respective loans, the Trust pools the receipts and distributes them monthly to certificate holders pursuant to the PSA's priority structure.[6]

II.     *The Hardage Loan*

One of the loans in the Trust was a fixed-rate mortgage loan owed by Hardage Hotels I, Inc. ("Hardage"). The loan had a balance of approximately $91 million when it was transferred to the Trust, a fixed interest rate of 9.54 percent, and a maturity date of July 11, 2017.[7]

In late 2002, Hardage faced certain financial difficulties. In March 2003, CMSLP, as special servicer, waived restrictions on Hardage's prepayment of loan principal – restrictions that protected those with rights to interest payments – ostensibly to accommodate those difficulties.[8] In July 2003, CMSLP sold the loan to a third party for $74.4 million – a discount from the principal outstanding balance of about $80.7 million.[9] It treated the sale proceeds as a payment of principal for disbursement purposes.[10]

---

[5] *Id.* § 4.01.

[6] Pl. Rule 56.1 Statement, DI 78 ("Pl. 56.1 St.") ¶ 9.

[7] *Id.* ¶ 76.

[8] Complaint ("Cpt.") ¶¶ 57-59.

[9] *See* LaBelle Decl., DI 146 ("LaBelle Decl.") ¶ 22.

[10] Cpt. ¶ 62.

4

III.   *Class A-1*

Class A-1 was a principal- and interest-receiving class with an original principal balance of $652.7 million and an interest rate of 7.1 percent.[11] At all times relevant here – that is, when the Hardage loan was modified and sold – it was the senior class with an outstanding principal balance.[12] It therefore received all of the proceeds from the loan's sale.

Class A-1's principal balance at the beginning of July 2003, the month during which the loan was sold, was approximately $348.4 million.[13] That month, it received a principal distribution of $75.8 million, $74.4 million of which derived from the sale of the Hardage loan, to reduce the class's principal balance to approximately $272.7.[14] The class continued to receive payments on that balance and the interest it generated until the principal balance was paid in full, as scheduled, in August 2007.[15]

IV.   *This Action*

In December 2005, plaintiffs, who own more than 25 percent of the interest-receiving Class A-CS2 certificates, initiated this action against CMSLP, its partner, CMSLP Management

---

[11] Trust Prospectus Supplement, DI 78 Ex. 2 at 1.

[12] Pl. 56.1 St. ¶ 31.

[13] *See* July 15, 2003 Trust Statement, DI 146 Ex. F at 1.

[14] *Id.*

[15] Greenspan Decl., DI 137 ("Greenspan Decl.") ¶ 10; LaBelle Decl. ¶ 26.

5

Company, Inc., and its parent company, CRIIMI MAE, Inc ("CRIIMI").[16] The complaint asserts that CMSLP breached the PSA by modifying and selling the loan to serve the interests of CRIIMI, which owned certain low-priority principal-receiving certificates, to the detriment of Class A-CS2 holders.

The focus of this motion is whether plaintiffs complied with a "no action clause" contained in the PSA in bringing this action. That clause provides, in relevant part, that:

> "No Certificateholder shall have any right to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless . . . the Holders of Certificates representing Percentage Interests of at least 25% of each affected Class of Certificates shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 30 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding."[17]

Accordingly, any investor suing under the PSA "must represent 25 percent in interest 'of each affected Class of Certificates' and request the trustee to commence the action in its own name."[18] For reasons the Court explained in *TIAA I*, this language means that plaintiffs may sue only if they represent 25 percent in interest of every class of certificates that was affected adversely by the sale of the Hardage loan.[19] As plaintiffs represent only Class A-CS2, the question is whether any other class was affected adversely. As the no action clause is a condition precedent to filing suit, the relevant time for

---

[16] *See generally* Cpt.

[17] PSA § 10.02.

[18] *TIAA I*, 681 F. Supp.2d at 505 (quoting PSA § 10.02).

[19] *Id.* at 506-09.

Plaintiffs persist in arguing that this ambiguous language should not be construed so as to require the participation of any class adversely affected to a *de minimus* extent. The Court rejects this argument for the same reasons it did so in *TIAA I. Id.*

6

determining harm is December 2005, when the action was initiated.[20]

Defendants assert that the sale of the Hardage loan adversely affected Class A-1. They sought dismissal on this ground in their prior motion for summary judgment, but the Court denied that motion after concluding that the record did not establish the lack of any genuine issue of material fact.[21] With trial in this matter imminent, defendants sought and were granted leave to renew their motion for summary judgment on this issue.

*Discussion*

I.   *Standard of Review*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[22] Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[23] In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[24]

---

[20] *TIAA I*, 681 F. Supp.2d at 509 & n.43.

[21] *Id.* at 508-09.

[22] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000); *see also* FED. R. CIV. P. 56(a).

[23] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[24] *See, e.g.*, *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001); *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997).

II.     *The Impact of the Sale of the Hardage Loan on Class A-1*

Under New York law, which governs the PSA,[25] plaintiffs would bear the burden at trial of proving compliance with any condition precedent where defendants contest such compliance.[26] Accordingly, to defeat defendants' motion for summary judgment, plaintiffs bear the burden of adducing admissible evidence that, if believed, would create a genuine issue of fact as to whether Class A-1 was affected adversely by the sale of the Hardage loan.

Defendants argue that the sale harmed Class A-1. They have submitted an expert declaration expressing the view that Class A-1 holders would have earned interest at a rate of between 2 and 3.5 percent – substantially less than the 7.1 percent at which they were earning interest on their principal balance – assuming that they had invested the sale proceeds in vehicles that were comparable in rating and maturity to Class A-1 certificates.[27] In other words, he contends that the sale proceeds were worth more to Class A-1 in the Trust than out if it. His estimate of the net aggregate loss suffered by Class A-1 varies with the reinvestment vehicle: Class A-1 holders allegedly would have lost approximately $10.3 million had they reinvested at a rate of 3.4 percent, approximately $12.1 million at a rate of 2.75 percent, and just under $14 million at a rate of 2.08 percent.[28]

---

[25]   PSA § 10.03.

[26]   *See Raymond v. Marks*, No. 96-9337, 1997 WL 345984, at *1 (2d Cir. June 24, 1997) (Table) (citing *Rachmani Corp. v. 9 East 96th St. Apartment Corp.*, 211 A.D.2d 262, 269, 629 N.Y.S.2d 382, 386 (1 Dep't 1995)); N.Y. C.P.L.R. 3015(a).

[27]   Greenspan Decl. ¶¶ 10-11.

[28]   *Id.* ¶ 12.

Plaintiffs argue, *inter alia*,[29] that Class A-1 benefitted from the sale of the Hardage loan. They have submitted a spreadsheet calculating the difference, as of the loan's sale, between (1) the net present value of Class A-1's investment in the Trust, assuming it paid off as it actually did following the sale, and (2) its net present value assuming the Trust paid off as originally scheduled (i.e. assuming that the loan had not been sold).[30] The difference allegedly represents Class A-1's loss or gain as a result of the sale. According to the spreadsheet, where the net present values are calculated using a discount rate of 7.058 percent, Class A-1 suffered a loss of just under $100,000. But where a discount rate of 7.1 percent is used, the class allegedly benefitted to the extent of $229.[31]

As illustrated by the parties' submissions, the determination whether the sale adversely affected Class A-1 turns on the discount rate used to measure the sale's effects. The sale of the Hardage loan conferred upon Class A-1 an accelerated principal disbursement but, by prematurely reducing Class A-1's outstanding principal balance, reduced the amounts of the scheduled interest distributions that the class thereafter received. To determine the sale's net effect on Class A-1, it therefore is necessary to compare the benefits (the accelerated principal disbursements) with the costs (the reductions in post-sale interest receipts). The benefits and costs, however, were realized at different points in time. As money is worth more in the present than in the future, a discount rate is needed to project the value of the accelerated principal disbursement forward (as defendants do) or

---

[29] The Court need not discuss plaintiffs' argument that Class A-1 was harmed less than previously estimated, or that any loss sustained by Class A-1 was *de minimus*. In light of the Court's construction of the no action clause, both of these arguments militate in favor of dismissal. The Court therefore considers only the portion of plaintiffs' argument that, if persuasive and supported, would result in a denial of defendants' motion.

[30] LaBelle Decl. Ex. H. The Court assumes without deciding that the spreadsheet and the portion of LaBelle's declaration explaining it are admissible.

[31] *See id.*

9

to discount the reductions in interest disbursements backwards (as plaintiffs do). This rate reflects both the time value of money and the risks associated with any investment.[32]

Determining a discount rate is an issue of fact on which the parties may adduce evidence.[33] Defendants' evidence indicates that an appropriate discount rate in these circumstances is between 2 and 3.5 percent, the interest that comparable investments – an accepted proxy for discount rates[34] – were earning when the loan was sold. Although plaintiffs argue that defendants' examples are not properly comparable,[35] their submission, even if credited, would demonstrate only that the sale did not harm Class A-1 *assuming* its effects are measured using a discount rate of approximately 7.1 percent or more. But that is necessarily true – if the discount rate used to compare the principal prepayment with the reductions in interest disbursements is the same as the rate at which Class A-1 already was earning interest, then the prepayment would have had no effect on the class. Under defendants' reinvestment analysis, for example, had Class A-1 holders invested the sale

---

[32] *See Elk v. United States*, 87 Fed. Cl. 70, 93 (Fed. Cl. 2009).

[33] *See Grace v. Corbis-Sygma*, 487 F.3d 113, 123-24 (2d Cir. 2007) (citing *Ammar v. United States*, 342 F.3d 133, 147-48 (2d Cir. 2003)); *see also Am. Fed. Bank, FSB v. United States*, 72 Fed. Cl. 586, 621 (Fed. Cl. 2006); *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 39-40 (2d Cir. 1980) (courts may apply a discount rate of 2 percent in discounting future damages where the parties do not submit evidence as to an appropriate rate), *cert. denied*, 451 U.S. 971 (1981). Although disputes over discount rates tend to be litigated with respect to damage calculations, the Court is aware of no reason, and the parties have suggested none, why the determination in these circumstances would not be an issue of fact.

[34] *E.g.*, *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 379 (4th Cir. 1995); *In re Equity Funding Corp. of Am.*, 391 F. Supp. 768, 772 (C.D. Cal. 1975); *see also* Bruce Stone, *The Prudent Investor Rule: Conflux of the Prudent Man Rule with Modern Portfolio Theory*, 229 PLI/EST 9, 22 (1993) ("The discount rate ordinarily should be determined by comparing the rate of return on comparable investments.").

[35] *See* LaBelle Decl. ¶ 30; Schultz Decl., DI 144 ¶ 9.

Case 1:06-cv-00392-LAK-KNF   Document 164   Filed 02/08/11   Page 10 of 11

10

proceeds in a bond earning interest at the rate that they previously had enjoyed, then (assuming no transaction costs) the sale would have had no effect on the value of their certificates.

As plaintiffs bear the burden of proving at trial that the sale did not harm Class A-1,[36] they cannot carry that burden with a theoretical illustration that the sale *might not* have harmed Class A-1.[37] To survive summary judgment, it was incumbent upon them to adduce admissible evidence that, if believed, would support the use of a discount rate of 7.1 percent or greater in these circumstances. They have not done so.[38] They suggest only that 2003 ten-year Treasury notes are relevant to determining an appropriate discount rate, but those notes were paying between 4 and 4.5 percent after the loan was sold[39] – far short of the 7.1 percent that plaintiffs need to prove.[40]

---

[36] Courts in other circuits have disagreed as to which party bears the burden of proving an appropriate discount rate for purposes of discounting future damages. *See Energy Capital Corp. v. United States*, 47 Fed. Cl. 382, 417 (Fed. Cl. 2000) (collecting cases), *rev'd in part on other grounds*, 302 F.3d 1314 (Fed. Cir. 2002). In this context, however, proof of an appropriate discount rate is part of plaintiffs' burden of proving that the sale did not harm Class A-1 and that, by extension, they complied with the PSA's no action clause.

[37] The mere possibility that "some would regard the prepayment as a positive development," Pl. 56.1 Counter-Statement, DI 147 ¶ 7 (citing Carey Decl., DI 143 Ex. 1 at 176-77), without more, does not suffice.

[38] The Court previously rejected plaintiffs' argument that it would be unreasonable to construe the no action clause as requiring the participation of classes that were harmed to a *de minimus* extent by the sale of the Hardage loan. *See supra* note 19. Even if that argument were persuasive, though, plaintiffs' failure to submit any evidence supporting an appropriate discount rate would be fatal to it – without a discount rate, the Court cannot determine the dollar effect that the sale had on Class A-1 and whether that effect was, in fact, *de minimus*.

[39] LaBelle Decl. ¶ 30 (citing *id.* Ex. I).

[40] It bears noting that neither party's analysis provides a concrete answer to the precise question at issue, to wit, the effect of the sale on Class A-1 *as measured when this action was brought in December 2005*. Defendants' evidence suggests that the sale harmed Class A-1 over the course of the class's remaining life based on the return available on comparable investments in July 2003. While not conclusive of the precise issue, this evidence at least supports the

11

In light of plaintiffs' failure to submit any evidence supporting the use of a discount rate of 7.1 percent or greater, there is no genuine issue of fact as to whether plaintiffs complied with the no action clause. They did not.

*Conclusion*

Defendants' motion [DI 133] for summary judgment dismissing the complaint is granted. All other pending motions are denied as moot. The Clerk shall close the case.

SO ORDERED.

Dated: February 8, 2011

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

proposition that the sale adversely affected Class A-1 as of December 2005 (it is mathematically possible, of course, that rates changed such that the sale was detrimental to Class A-1 as of July 2003 but beneficial as of December 2005). More important is that plaintiffs, who bear the burden of proving compliance with the no action clause, have not offered a shred of evidence supporting the use of a discount rate that would indicate such compliance.